146 F.3d 894
 330 U.S.App.D.C. 381, 8 A.D. Cases 348,
13 NDLR P 32
 Donald W. CRANDALL, Appellant,
v.
PARALYZED VETERANS OF AMERICA, Appellee.
 No. 97-7112.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 12, 1998.
Decided June 23, 1998.
 
 [330 U.S.App.D.C. 382] Appeal from the United States District Court for the District of Columbia (No. 95cv01741).
 John S. Lopatto, III argued the cause and filed the briefs, for appellant.
 Elizabeth Sarah Gere, argued the cause, for appellee. With her on the brief was Lisa Burns.
 Before: WALD, WILLIAMS and TATEL, Circuit Judges.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Paralyzed Veterans of America fired Donald Crandall for multiple acts of rudeness to fellow employees and outside groups working with Paralyzed Veterans. Crandall later disclosed to Paralyzed Veterans that he had been diagnosed as suffering from manic depression (or "bipolar disorder"), a disability that he claims caused his rudeness. He sued Paralyzed Veterans under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), alleging that it had discriminated against him "by reason of" his disability, by firing him and by failing to reasonably accommodate his psychological disability. The district court granted summary judgment for Paralyzed Veterans. First, it ruled that the Act did not cover the organization at the time of the alleged discrimination, because it was not at the relevant time "receiving Federal financial assistance," which is a predicate to liability under § 504. Second, the court held that no reasonable factfinder could have found that Paralyzed Veterans discriminated on the basis of Crandall's disability, since it had neither actual nor constructive notice of his disability when it fired him. We affirm on both grounds.
 
 
 2
 * * *
 
 
 3
 Crandall worked as a law librarian for nearly three decades at a number of firms, including Verner, Liipfert, Bernhard, McPherson & Hand in Washington, D.C. He left Verner, Liipfert after suffering a heart attack and associated anxiety and depression, but through the good offices of Robert Nelson, at one time a managing partner at Verner and later General Counsel of Paralyzed Veterans, was hired by Paralyzed Veterans in September 1991 for a permanent position as an "Information Specialist."
 
 
 4
 Crandall's stay there was not a happy one, for him or his co-workers: he was soon admonished by supervisors for his habit of verbal abuse. Nelson stuck up for him, arguing that Crandall's approach stemmed from his experience "in the law firm where everybody reacted quickly to everybody." Ultimately, however, Crandall abused the employees of an outside trade association, which sent Paralyzed Veterans a letter threatening to cut off access to its library. On September 10, 1992 Paralyzed Veterans drew the line and fired Crandall.
 
 
 5
 Crandall's written job application materials disclosed no disability, and he conceded in his deposition that he never told anyone at Paralyzed Veterans that he had been diagnosed with or treated for bipolar disorder or any other psychiatric disorder. In fact, in May 1991 he had been diagnosed as suffering from bipolar disorder and had been prescribed Lithium, complementing the Prozac he was already on as a result of his anxiety/depression diagnosis of the previous year. Irritable outbursts are apparently among a [330 U.S.App.D.C. 383] number of typical symptoms of the manic phase of bipolar disorder. See Diagnostic and Statistical Manual of Mental Disorders 328 (4th ed.1994).
 
 
 6
 * * *
 
 
 7
 Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:
 
 
 8
 No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 9
 Crandall was fired on September 10, 1992, but the term of Paralyzed Veterans' federal grant did not begin until September 11, 1992, according to the funding agency's letter approving the grant. (Paralyzed Veterans did not actually receive federal funds until August 1993.) The first question is whether the Act covered the dismissal of Crandall at all.
 
 
 10
 Crandall first seeks to move the date of alleged discrimination forward in time. Because Paralyzed Veterans promised to pay him through September 30, and for some time after September 10, 1992 preserved for Crandall an option of continuing his health insurance with Paralyzed Veterans's carrier, he says he should be counted as an employee throughout that period, pointing to some legal purposes for which the period of continued insurance access would constitute employment. But the object here is not to measure the duration of Crandall's employment, but rather to pinpoint the time of the alleged discriminatory act. And if Crandall was discriminated against at any time, it was when he was notified that his employment was terminated, not when his benefits ceased. Under Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), notice of final action fixes the timing of an act of employment discrimination for statute of limitations purposes, even when the employee actually works for a long time thereafter--in Ricks for a full year. Crandall offers no reason to use a different rule to fix the time of discrimination for purposes of relating the employer's conduct to the onset of statutory coverage, and he cites no cases making the solution turn on the continuation of pay or benefits.
 
 
 11
 Having failed to move the date of alleged discrimination forward past September 10, 1992, Crandall next tries to move the date of Paralyzed Veterans's coverage by the Act backwards in time. Here he argues that because it pledged in June 1992 in its federal grant application to abide by federal rules and regulations, it was bound by § 504 even before it was awarded a grant.
 
 
 12
 But Paralyzed Veterans's anti-discrimination assurances and general promise to abide by applicable rules were expressly stated as promises to do so "if the application is approved." Moreover, although the letter from Legal Services Corporation approving the grant was dated September 4, 1992, the letter made the grant contingent on acceptances by the grantees (which appear to have occurred on September 14, 1992), and set September 11, 1992 as the starting date of the grant. Crandall does not explain how Paralyzed Veterans's contingent promises could have become binding before it actually bound itself to the grant terms by accepting the government's offer in the manner it prescribed. Thus both the formal start of the grant period and Paralyzed Veterans's contractual commitment came after the date of Crandall's dismissal. The district court was correct to hold that § 504 did not apply at the time of the alleged act of discrimination. We assume in Crandall's favor, without deciding, that either of those dates was controlling, rather than Paralyzed Veterans's actual receipt of funds or its start on the work funded by the grant.[1]
 
 
 13
 In any event, § 504 prohibits only discriminatory acts performed "solely by reason of" the plaintiff's handicap. The courts [330 U.S.App.D.C. 384] of appeals have overwhelmingly agreed that for this causal link to be shown the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability. They have so found under both the Rehabilitation Act itself and the analogous provision of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a) (providing that no employer "shall discriminate against a qualified individual with a disability because of the disability of such qualified individual...."). See, e.g., Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 163 (5th Cir.1996) ("To prove discrimination [under the ADA], an employee must show that the employer knew of such employee's substantial physical or mental limitation."); Morisky v. Broward County, 80 F.3d 445, 447-49 (11th Cir.1996) (liability under the ADA requires actual or constructive notice of the disability); Collings v. Longview Fibre Co., 63 F.3d 828, 834 (9th Cir.1995) (assuming plaintiffs had a medically recognizable drug disability, they could not make out a case under the ADA where they could not show that employer was aware of it); Miller v. National Casualty Co., 61 F.3d 627, 629 (8th Cir.1995) (under ADA, "[b]efore an employer must make accommodation for the physical or mental limitation of an employee, the employer must have knowledge that such a limitation exists."); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir.1995).
 
 
 14
 In Hedberg, for example, the plaintiff suffered from primary amyloidosis, a degenerative condition that causes fatigue (and often death). He was fired for poor job performance, including tardiness and laziness, and the tardiness and laziness may have been a product of his disability. 47 F.3d at 933. Like Crandall, Hedberg had not disclosed the disability to his employer before he was terminated. The court held that if Hedberg had been fired just on account of his tardiness and laziness,
 
 
 15
 [t]he ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior.
 
 
 16
 Id. at 934.
 
 
 17
 In an effort to parry Paralyzed Veterans's notice argument, Crandall points to authority that seems to equate dismissal for conduct arising from a disability with dismissal "by reason of" the disability. Here he rests on Teahan v. Metro-North Commuter Railroad Co., 951 F.2d 511 (2d Cir.1991), in which an alcoholic employee was laid off because of excessive, alcohol-induced, absenteeism. The employer, whose awareness of the disability was undisputed, defended on the ground that it could fire a disabled employee when it relied merely on the symptoms of the disability, and not on the disability itself. In this context, considering whether the dismissal could have been "solely by reason of [plaintiff's] handicap," the court said that "the relevant inquiry" was whether the employee was discharged solely for conduct caused by the underlying disability. If so, then the employee was discriminated against solely by reason of his handicap, in violation of § 504. Id. at 517.
 
 
 18
 We doubt whether, even apart from the notice issue, Teahan can be read to endorse the general proposition that if a disability causes poor job performance, and if the poor performance causes dismissal, then the dismissal was "by reason of" the disability. Such a reading would be in direct conflict with other circuits. See Palmer v. Circuit Court of Cook County, 117 F.3d 351, 352 (7th Cir.1997); Newland v. Dalton, 81 F.3d 904, 906 (9th Cir.1996); Little v. FBI, 1 F.3d 255, 258-59 (4th Cir.1993); Taub v. Frank, 957 F.2d 8, 11 (1st Cir.1992). It seems more probable that the court intended merely to be sure that employers could not get off the hook by showing that they bore no discriminatory animus against the disability itself, independently of their attitude toward its manifestations. This purpose is suggested by Teahan's example of a limping employee whose limp causes him to make an annoying thumping noise: the employer could not defend firing the employee for the thumping, [330 U.S.App.D.C. 385] rather than the limping, on the grounds that the employer only cared about thumping. Id. at 516-17.
 
 
 19
 In any event, whatever the merits of a broad reading of Teahan for cases where the employer has notice of the disability, we can see none in the absence of notice. The Second Circuit could hardly have resolved its hypothetical of the thumping employee as it did if the employee had no apparent limp, merely an unexplained tendency to make irritating noises. Especially in any area where medical appraisals are relatively contestable or contingent on patients' self-descriptions, dispensing with a notice requirement would invite employees to manipulate the statutory protection, securing post hoc disability diagnoses that encompass the conduct leading to their firing. (We make the point not because there is the slightest suggestion that Crandall fabricated his disability--there is none--but to illustrate the perverse consequences of a rule dispensing with notice.) If the behavior is "not so obviously [a] manifestation[ ] of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," Hedberg, 47 F.3d at 934, and the employer has no other notice of the disability, there can be no actionable discrimination.
 
 
 20
 On Paralyzed Veterans's motion for summary judgment the question was whether Crandall had offered evidence from which a reasonable person could find that Paralyzed Veterans had any notice, actual or constructive, regarding his disability. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In our only prior ruling on the form of the notice the plaintiff must give the defendant, we rejected the proposition that there must be "precise notice." See Blackwell v. U.S. Dep't of the Treasury, 830 F.2d 1183 (D.C.Cir.1987). Here, too, no great refinement of the concept of notice is needed, beyond the bedrock requirement of an adequate, prior alert to the defendant of the plaintiff's disabled status.
 
 
 21
 Insofar as Crandall claims that his rude behavior itself was so extreme as to afford notice, we reject his claim. A layman cannot reasonably be expected to infer a psychiatric disorder merely from rudeness, given the prevalence of rudeness without psychiatric disorder. Alternatively, Crandall tries to satisfy the notice requirement by pointing to conversations with Nelson (occurring first at Verner, Liipfert and later at Paralyzed Veterans) arising out of his 1990 application to Verner, Liipfert's insurer, UNUM, for total disability benefits. The insurer denied the claim and Crandall executed a release in exchange for a small settlement. In the course of this he discussed with Nelson the possibility of an administrative appeal of UNUM's decision. But Crandall did not say in his deposition that he told Nelson of even having claimed a psychiatric disability. At oral argument Crandall's counsel repeatedly mentioned the 1991 diagnosis's reference to psychiatric disability, and Nelson's testimony that he did not recall ever seeing the diagnosis. Despite Crandall's efforts to make Nelson's non-recollection look fishy, he offered no reason to suppose that Nelson would have seen the diagnosis in the ordinary course of his work at Paralyzed Veterans (it was issued four years after Nelson left Verner, Liipfert). Thus Crandall can extract nothing useful from Nelson's testimony on the point.
 
 
 22
 Finally, Crandall points to Nelson's efforts to excuse Crandall's rudeness by reference to his longtime exposure to work in big law firms. Whatever the merits of this as an explanation of rudeness, we fail to see how Nelson's effort to help his former colleague hold his job is evidence that Nelson (or anyone else at Paralyzed Veterans) was aware of Crandall's disability.
 
 
 23
 We express no opinion whether, had he shown statutory coverage and notice, Crandall's claim could otherwise have survived summary judgment.
 
 
 24
 * * *
 
 The judgment of the district court is
 
 25
 Affirmed.
 
 
 
 [1]
 Crandall points to the publication in the July 29, 1992 Federal Register of an announcement about the grant. But since the statement merely expresses the Legal Services Corporation's "intention to award" the grant, see 57 Fed.Reg. 33528 (July 29, 1992), we do not see how it could support a finding that Paralyzed Veterans was "receiving Federal funds" as of that date, the condition that triggers § 504 liability