# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 17, 2014        Decided August 15, 2014

No. 12-5123

LINDA SOLOMON,
APPELLANT

v.

THOMAS J. VILSACK, SECRETARY OF AGRICULTURE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01590)

*John F. Karl Jr.* argued the cause and filed the briefs for appellant.

*Denise M. Clark* and *Les Alderman* were on the brief for *amicus curiae* Metropolitan Washington Employment Lawyers Association in support of appellant. *Alan R. Kabat* entered an appearance.

*Brian P. Hudak*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

2

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by Circuit Judge MILLETT.

MILLETT, *Circuit Judge*: Invoking the protections of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, Linda Solomon sought substantial flexibility in her working hours—what is known as a "maxiflex" schedule—as an accommodation for her disability. She alleges that she informally enjoyed a similar accommodation for multiple months, and that her employer allowed at least one other employee in a comparable position in her office to work a similarly flexible schedule. The Department of Agriculture nevertheless denied her request for such a flexible work schedule, and Solomon filed suit. The district court granted summary judgment to the Department on the ground that, as a matter of law, a maxiflex work schedule is an unreasonable accommodation request. The district court also rejected her retaliation claims on the related ground that, having sought what the court deemed to be an unreasonable accommodation, there could not have been retaliation as a matter of law.

We reverse in part because the essential legal predicate of the district court's decision was wrong. Nothing in the Rehabilitation Act establishes, as a matter of law, that a maxiflex work schedule is unreasonable. We leave open for resolution on remand the factual questions of whether or not a maxiflex schedule or other accommodations would have been reasonable in this case and whether or not Department employees retaliated against Solomon by denying her the ability to work late as she had previously been permitted to do. We affirm the balance of the district court's judgment.

## I.  BACKGROUND

### A.  Statutory Framework

The Rehabilitation Act "was the first major federal statute designed to provide assistance to the whole population of" individuals with disabilities.  *Shirey v. Devine*, 670 F.2d 1188, 1193 (D.C. Cir. 1982).  The Act's purpose is to ensure that the federal government is "a model employer of individuals with disabilities," 29 C.F.R. § 1614.203(a), and is proactive in their "hiring, placement, and advancement," 29 U.S.C. § 791(b).

The Act, as amended, directs courts to employ the standards of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, in evaluating suits that, as relevant here, allege that an employer unlawfully denied an accommodation.  *See* 29 U.S.C. § 791(g); *see also* 29 C.F.R. § 1614.203(b) (applying to the Rehabilitation Act the standards in the Americans with Disabilities Act regulations, 29 C.F.R. Part 1630).  Specifically, the Rehabilitation Act requires federal employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  An "individual with a disability" includes a person with "a physical or mental impairment that substantially limits one or more major life activities.*"  Id.* § 12102(1)(A).  To be a "qualified individual" entitled to the Rehabilitation Act's protections, an individual must be able to perform, "with or without reasonable accommodation," "the essential functions of the employment position that such individual holds or desires."  *Id.* § 12111(8).

The Rehabilitation Act also forbids retaliation against or coercion of individuals who seek to vindicate the rights

guaranteed by the statute. The Act does so by making it unlawful both (i) to retaliate "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," 42 U.S.C. § 12203(a), and (ii) to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter," *id.* § 12203(b).

## B. Factual Background

**1.** Starting in 1997, Linda Solomon worked as a budget analyst in the Administrative Programs Branch of the Budget Division within the Department of Agriculture's Rural Development Mission Area. *Solomon v. Vilsack*, 845 F. Supp. 2d 61, 64 (D.D.C. 2012). She received a superior performance evaluation in 2003 from her direct supervisor, Sylvia Booth, the Chief of the Administrative Programs Branch, and Booth's supervisor Deborah Lawrence, the Director of the Budget Division. Solomon carried a higher workload than the other budget analysts in the office and rose to the level of senior budget analyst.[1]

Solomon has a long history of depression dating back to the 1980s. Her illness intensified in late 2003 and early 2004

---

[1] While the ultimate determination of what happened in this case is for the trier of fact, in reviewing the grant of summary judgment to the Secretary, we view the evidence in the light most favorable to Solomon, drawing all reasonable inferences in her favor. *See, e.g.*, *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010).

due to numerous personal hardships, and she began receiving treatment from a psychiatrist, Dr. Dennis Cozzens. *Solomon*, 845 F. Supp. 2d at 64. Her deteriorating condition made it difficult for her to maintain her normal work schedule. On some days, Solomon woke up too sick to work until the afternoon, when her condition improved; on other days, she was able to work in the morning but not in the afternoon. As a result, Solomon was out of the office a significant amount of time in the first ten weeks of 2004. *Id.*

Despite her intensifying depression, Solomon continued to perform all of her job duties and to complete all of her work. She did so by using leave for hours missed during her normal duty schedule, and then working additional unscheduled hours without pay. For example, she would start work at 5:00 a.m. one day, or work until 10:00 or 11:00 p.m. the next. *Solomon*, 845 F. Supp. 2d at 68. When needed, she would take work home to meet a deadline. Because of her efforts, Solomon never missed a single work deadline throughout the acute phase of her illness. Nor were there any complaints about her work performance.

Booth knew that Solomon was working this modified schedule, and she signed Solomon's bi-weekly time cards that reported the missed hours as charged leave. According to Solomon, her division also allowed a fellow budget analyst to work outside her normal duty hours. Solomon observed her fellow analyst arriving late and staying until 8:00 p.m., sometimes working late right alongside Solomon. *Solomon*, 845 F. Supp. 2d at 68.

In February 2004, Solomon obtained permission from Booth to hang a simple privacy curtain at the entry of her cubicle. She claimed that it was needed to minimize distraction and to aid her concentration. For that same reason,

Solomon also asked that her cubicle be relocated to a quieter area, but the Department never acted on that request.

Throughout that same time, Solomon was also pursuing the informal grievance process with an Equal Employment Opportunity (EEO) counselor to resolve what she viewed as discriminatory action by Booth and Lawrence in charging her with being absent without leave for 1.5 hours one day in December 2003.

**2.** On March 2, 2004, Solomon emailed Booth, apologizing for her erratic leave and explaining that she was under a doctor's care for a relapse of her chronic depression. Booth replied that, if Solomon's condition required "special accommodations" and could impact her "normal duty schedule," she should provide "medical documentation." On March 29th, Solomon responded with a letter from Dr. Cozzens explaining that Solomon suffered from "chronic depression, anxiety and insomnia" and requesting "a flexible work schedule * * * to assist her with her medical treatment." Solomon understood the request for a "flexible work schedule" to mean the ability to come to work late or to work late hours if her depression so required, much like she had been doing for months.

Meanwhile, unable to come to a resolution with Booth and Lawrence with respect to her informal EEO grievance, Solomon received notice of her right to file a formal complaint on February 10, 2004. Solomon, however, made one last attempt to address the issue informally by emailing Lawrence's superior on March 18, 2004. That effort failed four days later, when Arleen Christian, the Chief of the Human Resources Personnel Branch, instructed Lawrence's superior that the matter would have to be resolved through the formal EEO process.

Just a few weeks later, on April 6th, Deborah Lawrence, in the company of William French, who was Booth's successor as Chief of the Administrative Programs Branch, rejected Solomon's request for a flexible schedule as an accommodation for her disability. Lawrence's memorandum asked that Solomon submit further "medical documentation" by April 16th to demonstrate "the existence of [her] medical condition and the necessity for the [requested] changes in duty location and hours of duty." Solomon was unable to get Dr. Cozzens to submit further medical documentation in time to meet that ten-day deadline, but she alleges that management, including Lawrence, already was informed about her disabling condition—a fact that the Secretary does not dispute on appeal. The memorandum separately ordered Solomon to remove the privacy curtain from her cubicle on the ground that it "could cause harm to yourself and others."

**3.** On April 12th, Solomon filed a formal complaint of discrimination with the Department of Agriculture's Office of Civil Rights referencing the December 2003 absent-without-leave incident. She listed as the bases for discrimination "race, reprisal, color, age, [and] disability."

Eleven days later, on April 23rd, Solomon, though feeling unwell, went to work because she needed to finish a project. She arrived late. As before, she planned to stay late, without any additional compensation, to ensure the project's timely completion. French was off that day, so Solomon informed Norma Torres, her temporary direct supervisor, about her plans. Torres and her supervisor sought instruction from Arleen Christian, the Human Resources Chief. At Christian's direction, Solomon's supervisors refused to allow her to work past 6:00 p.m.

Angered and frustrated by that abrupt refusal to permit her to complete her work as she had previously been allowed, Solomon went home. *Solomon*, 845 F. Supp. 2d at 69. Too ill to work, Solomon wrote French on April 27th to inquire why her temporary supervisors had barred her from working late, and noting that she had been allowed to do so for months by her previous supervisor. French responded a week later, warning Solomon that she would be considered "absent without leave" until she provided medical documentation of her incapacitation. French also forbade Solomon to work past 6:00 p.m. without his approval. Solomon continued to seek resolution of these issues with French. (Lawrence was out of the office on April 23rd through at least May 17th.) But French, at the instruction of Christian, simply repeated that Solomon would remain absent without leave until she provided the requested documentation. According to Dr. Cozzens, "to a reasonable degree of medical certainty," those actions "substantially worsened [Solomon's] condition."

For the next month, Dr. Cozzens corresponded with Solomon's supervisors. On May 10th, he updated them on Solomon's medical condition, explaining that her severe depression "has prevented her from attending work since her last appointment on 4/26/04," and that her prognosis was "guarded." On June 2nd, he advised them that Solomon remained unable to work due to continued psychiatric symptoms. Once Solomon's condition improved, Dr. Cozzens explained, she could "return to work, initially on a part-time basis" as early as mid-July, if afforded appropriate accommodations.

Throughout that same time, Solomon herself continued communicating with her supervisors. On May 26th, she emailed French, asking for permission "to telecommute on a part-time schedule." When French forwarded Solomon's

request to Lawrence, Christian, and other management personnel in human resources, Christian recommended against it, and French denied the accommodation. Solomon also repeatedly asked that she be advanced paid sick leave. While her supervisors denied that request, they did allow her to take substantial amounts of leave without pay and to participate in the Department's leave donor program. *Solomon*, 845 F. Supp. 2d at 69–70.

Solomon subsequently applied for permanent disability retirement. *Solomon*, 845 F. Supp. 2d at 70. In her view, that was the only option left to her given the Department's continued refusal to provide any of her requested accommodations. Her retirement took effect in January 2005.

## C. Procedural History

After exhausting her administrative remedies, Solomon filed suit against the Secretary of Agriculture, in his official capacity, in the United States District Court for the District of Columbia, alleging violations of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* She alleged, in particular, that the Secretary's refusal to provide reasonable accommodations for her disability violated the Rehabilitation Act. *See* 29 U.S.C. § 791(g); 42 U.S.C. § 12112(a) & (b)(5). She also alleged that her supervisors had unlawfully retaliated against her for engaging in activities protected by the Rehabilitation Act, Title VII, and the Age Discrimination in Employment Act.[2]

---

[2] *See* 42 U.S.C. § 12203(a) (as extended to the Rehabilitation Act, 29 U.S.C. § 791(g)); 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 633a(c);

The district court initially granted summary judgment for the Secretary on the ground that Solomon's receipt of disability retirement benefits was predicated on her showing that she could not perform the duties of her position even if reasonably accommodated, and thus it precluded her Rehabilitation Act claims as a matter of law. *Solomon v. Vilsack*, 656 F. Supp. 2d 55, 57 (D.D.C. 2009). This court reversed, explaining that, because Solomon's retirement application never stated that she would have been unable to work if she had been afforded the accommodations she sought, a jury could find that Solomon's application was consistent with her claim that "she could have worked in the spring and summer of 2004 with reasonable accommodation." *Solomon v. Vilsack*, 628 F.3d 555, 565–567 (D.C. Cir. 2010).

On remand, the district court granted the Secretary's renewed motion for summary judgment. *Solomon*, 845 F. Supp. 2d at 77. The district court ruled that the flexible work schedule that Solomon principally requested was unreasonable as a matter of law. *Id.* at 71–73. The court then held that Solomon was not a "qualified individual" with a disability because she needed such an unreasonable accommodation to perform her job. *Id.*

The district court also denied Solomon's Title VII retaliation claim as legally precluded by the unreasonableness of the requested accommodation. The court further ruled that Solomon failed to demonstrate a causal connection between her initiation in December 2003 of the EEO grievance process and the later denials of her accommodation requests, and that Solomon could not base a retaliation claim on a mere showing that a requested accommodation was denied. *Solomon*, 845 F. Supp. 2d at 75–77.

*see also Gomez-Perez v. Potter*, 553 U.S. 474, 477 (2008); *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).

Solomon timely appealed the district court's judgment.

## II. STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, and can affirm only if the record demonstrates both that "there is no genuine issue as to any material fact," and that "the moving party is entitled to a judgment as a matter of law." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (internal quotation marks omitted). Our task is not to "'determine the truth of the matter,' but to "decide only 'whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). We likewise review *de novo* the district court's conclusion that a requested accommodation is unreasonable as a matter of law. *See United States v. Berry*, 618 F.3d 13, 16 (D.C. Cir. 2010) (questions of law reviewed *de novo*).

## III. SOLOMON'S ACCOMMODATION CLAIM

To avert summary judgment, Solomon had to come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability, *see Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 896–897 (D.C. Cir. 1998); (iii) she was able to perform the essential functions of her job with or without reasonable accommodation, *see* 42 U.S.C. § 12112(b)(5)(A); and (iv) her employer denied her request for a reasonable accommodation of that disability. *See Stewart v. St. Elizabeths Hospital*, 589 F.3d 1305, 1308 (D.C. Cir. 2010).

In this case, the Secretary acknowledges that the Department of Agriculture was on notice of both Solomon's medical condition and her request for a flexible work schedule. Secretary Br. 15–17. He also does not dispute that,

on the current record, a reasonable jury could find that Solomon's chronic depression, with the severe limitations it inflicted on her ability to work and to perform the routine activities of daily living, constitutes a "disability" within the meaning of the Rehabilitation Act. *See* Secretary Br. 13 (describing how Solomon's depression rendered it difficult or impossible for her to work "beginning in Spring 2004"). Most importantly, the Secretary does not deny that, *if* a maxiflex schedule were a reasonable accommodation for Solomon's work as a budget analyst, a reasonable jury could conclude that Solomon could otherwise have performed all the essential functions of her job when she sought that accommodation in March 2004.

Accordingly, the question before this court at this procedural juncture is whether, on this record, a jury could reasonably find that the maxiflex schedule that Solomon requested could be a "reasonable" accommodation, within the meaning of the Rehabilitation Act, for her position as a budget analyst. We hold that a jury could so find and that the district court's conclusion that maxiflex is unreasonable as a matter of law was wrong.[3]

### A. Flexible Work Hours Can Be A Reasonable Accommodation

Determining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry. *See Taylor v. Rice*, 451 F.3d 898, 908 (D.C. Cir. 2006) ("An accommodation may be 'reasonable on its face'

---

[3] The Secretary argues that no reasonable jury could find that the Department denied Solomon's request for a flexible schedule. Secretary Br. 44–45. Because the Secretary did not make that argument before the district court, it is forfeited. *See Flynn v. Commissioner*, 269 F.3d 1064, 1068–1069 (D.C. Cir. 2001).

13

\* \* \* or it may be reasonable as applied, *i.e.*, *'on the particular facts' of the case*") (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 405 (2002)) (emphasis added). That is because the contours and demands of an employment position and the capacities of a workplace can vary materially from employer to employer. *See McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (rather than deciding cases "based on 'unthinking reliance on intuition about the methods by which jobs are to be performed,' a court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice'") (citation omitted). Technological advances and the evolving nature of the workplace, moreover, have contributed to the facilitative options available to employers (although their reasonableness in any given case still must be proven). *See EEOC v. Ford Motor Co.*, 752 F.3d 634, 641 (6th Cir. 2014) (because of "the advance of technology in the employment context," "attendance at the workplace can no longer be assumed to mean attendance at the employer's physical location"). For those reasons, it is rare that any particular type of accommodation will be categorically unreasonable as a matter of law. This case is no exception.

Solomon requested a maxiflex schedule that would afford her the ability to come to work late on certain days or leave early on other days, as her condition required, as long as all her work was completed properly and in a timely and secure manner. *See generally* U.S. OFFICE OF PERSONNEL MANAGEMENT, HANDBOOK ON ALTERNATIVE WORK SCHEDULES, *available at* http://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/handbooks/alternative-work-schedules/ ("maxiflex schedule" is one "that contains core hours on fewer than 10 workdays in the biweekly pay period and in which a full-time employee has a basic work requirement of 80 hours for the biweekly pay period, but in

which an employee may vary the number of hours worked on a given workday or the number of hours each week within the limits established for the organization").

The Secretary argues, and the district court agreed, *Solomon*, 845 F. Supp. 2d at 72, that the "ability to work a regular and predictable schedule" is, "as a matter of law, an essential element of any job," Secretary Br. 38–39. That is incorrect. While the appropriateness of flexible working hours as an accommodation in any given case will have to be established, nothing in the Rehabilitation Act takes such a schedule off the table as a matter of law. Quite the opposite, the Rehabilitation Act, through its incorporation of the Americans with Disabilities Act's standards, *see* 29 U.S.C. § 791(g), is explicit that a "reasonable accommodation" may include "job restructuring" and "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B); *see also* 5 C.F.R. § 610.111(d) (Office of Personnel Management regulations permit agencies to establish flexible or compressed work schedules); U.S. OFFICE OF PERSONNEL MANAGEMENT, NEGOTIATING FLEXIBLE AND COMPRESSED WORK SCHEDULES (July 1995) (federal employment regulations do not prescribe any "minimum or maximum amount of flexibility" with respect to work schedules established by federal employers).

Our sister courts, too, have recognized that "[p]hysical presence at or by a specific time is not, *as a matter of law*, an essential function of all employment." *McMillan*, 711 F.3d at 126 (emphasis added). Instead, "penetrating factual analysis" is required to determine whether a rigid on-site schedule is an essential function of the job in question. *Id.*; *see also Ward v. Massachusetts Health Research Inst., Inc.*, 209 F.3d 29, 34–35 (1st Cir. 2000) (employer must specifically prove that "a regular and reliable schedule" is an essential element of a position, which "requires a fact-intensive inquiry").

The Secretary, moreover, need only look around the neighborhood to witness both the availability and viability of maxiflex work schedules specifically within the federal government. The Office of Personnel Management, which is responsible for "executing, administering, and enforcing" rules and regulations governing federal employment, 5 U.S.C. § 1103, has identified maxiflex as a potential option for qualifying federal employment positions. *See* HANDBOOK ON ALTERNATIVE WORK SCHEDULES, *supra*. In addition, the Chief of Human Resources for Solomon's division admitted that "some agencies" provide maxiflex as a potential workplace option.

Both the district court and the Secretary invoked *Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994), as establishing that a regular and predictable schedule is an essential function of all jobs. That greatly overreads *Carr*. In that case, the evidence showed that Carr's job required her to pick up and code papers for input into a computerized database at precisely 4:00 p.m. each day. *Id.* at 527. Her disability caused her to miss work on short notice, often when commuting in the morning, and so incapacitated her that she was unable to perform even the basic task of calling in sick. *Id.* Carr's frequent, unpredictable, and abrupt absences caused the lone remaining clerk undue hardship because that clerk, time and again and without warning, had to do twice the work in the same amount of time. *Id.* In addition, Carr conceded that her job involved "tight 4:00 p.m. deadlines." *Id.* at 530. This court stressed that those unique and undisputed facts made *Carr* the "*unusual* Rehabilitation Act case that * * * can be resolved against the plaintiff without extensive fact finding." *Id.* at 531 (emphasis added).

Our categorization of *Carr* as "unusual" means it could not have been the genesis of a sweeping and categorical legal

rule against substantial flexibility in work hours. Subsequent precedent proves the point. In *Breen v. Department of Transportation*, 282 F.3d 839 (D.C. Cir. 2002), we held that *Carr* had no application to a case where (as here) the plaintiff sought a modified work schedule and did not "concede[] that there was a critical element of her position—such as a daily deadline—that rendered the accommodation she proposed ineffectual," *id*. at 843. Because Breen "offered evidence disputing her employer's claim that the job restructuring she proposed was incompatible with the essential functions of her position," we reversed the grant of summary judgment. *Id.*

In the same vein is *Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007). Woodruff sought accommodations that, in the past, the agency had *de facto* afforded him: the ability to set his own schedule and to take breaks in the middle of the day. *Id.* at 528. Because Woodruff came forward with evidence that his job did not require him "to be physically present in the office," and that he had successfully performed the "essential functions" of his job when he was previously afforded those accommodations, we held that "his case is at least strong enough to escape summary judgment." *Id.*

Accordingly, the district court's holding that an "open-ended" or maxiflex schedule is "unreasonable as a matter of law," *Solomon*, 845 F. Supp. 2d at 72, is incorrect. Whether a maxiflex or other flexible workplace schedule is a reasonable accommodation for a given employee in a given position is a case-by-case factual inquiry, not a foreordained legal conclusion.

## B. Solomon's Flexible Hours Accommodation Claim Survives Summary Judgment

Like the plaintiffs in *Breen* and *Woodruff*, Solomon discharged her duty of coming forward with evidence from

which a reasonable jury could find that a strict work-hours regimen was not an essential function of her job. While the Secretary argues (Br. 43) that Solomon's job involves "tight, unpredictable, and firm deadlines," Solomon answered with evidence that short deadlines are infrequent and, when they arise, can be met with a maxiflex schedule. Indeed, Solomon showed—and it was not disputed by the Secretary—that she met every single work deadline through April 23, 2004, by working such a flexible schedule. *Solomon*, 845 F. Supp. 2d at 68. Solomon reinforced that record with evidence that the Department had permitted a fellow budget analyst to work similarly flexible hours. *Id.*; *see also Langon v. Department of Health and Human Services*, 959 F.2d 1053, 1060–1061 (D.C. Cir. 1992) (evidence undermined employer's contention that the job had "short deadlines" and required "frequent face-to-face contacts," creating "a genuine issue about whether, with the accommodation," "Ms. Langon could perform the essential functions of her position").

The district court acknowledged that Solomon never missed "any actual deadline" during the period at issue. *Solomon*, 845 F. Supp. 2d at 71–72. But the court dismissed that evidence, surmising that "it may have merely been good luck that [Solomon] was able to meet [her] deadlines with such extensive absences." *Id.* at 72. Summary judgment cannot rest on such speculation about evidence. "By weighing the evidence and reaching factual inferences" in the Secretary's favor, the district court "failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in h[er] favor.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 1868 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255) (first alteration in original).

In sum, Solomon discharged her summary-judgment duty of coming forward with sufficient evidence for a reasonable jury to find in her favor on all four elements of her accommodation claim, and for that reason we reverse the district court's grant of summary judgment on that claim. We need not decide whether Solomon's additional accommodation requests—for a privacy curtain, relocation of her cubicle, advance sick leave, and a part-time, telecommuting schedule—independently created jury questions. Those additional requests may have been intended as alternative or temporary accommodations, or as complements to the flexible schedule. We leave for the trier of fact the question whether Solomon's requests, individually or collectively, would have enabled Solomon to perform the essential functions of her position without undue hardship to the Department. *See Breen*, 282 F.3d at 843 n.6.[4]

## IV. SOLOMON'S RETALIATION CLAIMS

Solomon presses her retaliation claims under two theories: First, Solomon contends that her supervisors retaliated against her for pursuing the EEO grievance process. Second, she maintains that the Department, in violation of the Rehabilitation Act, retaliated against her for making accommodation requests. Solomon argues a jury could find that her supervisors retaliated against her for those protected activities by withdrawing her informal accommodations: that

---

[4] Solomon argues in the alternative that, even if none of the accommodations she requested was reasonable, they were sufficient collectively to trigger the Department's obligation to engage in the interactive process in an effort to find a reasonable accommodation for her. Solomon Br. 45–52. Because we conclude that a reasonable jury could find on this record that the Department denied Solomon a requested reasonable accommodation, we decline to reach that argument.

is, by banning her from working after 6:00 p.m., and by ordering her to remove her privacy curtain. She also argues that they retaliated by denying, after April 23rd, the accommodation requests she made for relocation of her cubicle, advance sick leave, and part-time telecommuting. Solomon Br. 53.

Because Solomon has come forward with sufficient evidence from which a jury could reasonably infer that her supervisors banned her from working after 6:00 p.m. in retaliation for requesting accommodations, we reverse the district court's entry of summary judgment on that Rehabilitation Act retaliation claim. We affirm the grant of summary judgment with respect to her other retaliation claims.[5]

## A.  Preservation of the Retaliation Claims

The Secretary opens with a threshold challenge that Solomon never properly pleaded any distinct retaliation claim under the Rehabilitation Act, and that Solomon never alleged a retaliatory withdrawal (under any statute) of informal accommodations that the agency previously afforded her. Secretary Br. 52, 54. Those arguments come too late.

Solomon argued her Rehabilitation Act retaliation claim in her opposition to the Secretary's first motion for summary judgment. *See* Pl.'s Opp'n to Def.'s Mot. For Summ. J. at 2, ECF No. 29, No. 07-01590-JDB (D.D.C. May 8, 2009). The Secretary made no mention of a failure to plead then. *See generally* Reply in Supp. of Def.'s Mot. For Summ. J., ECF No. 34, No. 07-01590-JDB (D.D.C. June 8, 2009).

---

[5] Solomon does not mention her retaliation claim under the Age Discrimination in Employment Act, so it is forfeited. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

Furthermore, in her previous appeal, Solomon expressly argued that her requests for accommodation constituted protected activity under the Rehabilitation Act, and that the Department of Agriculture denied those requests for retaliatory reasons. Solomon Br. 57–60, No. 09-5319 (D.C. Cir. June 9, 2010). Solomon also argued that the Department withdrew her informal accommodations in retaliation for her protected activity. *Id.* at 56–57. The Secretary again failed to argue that Solomon had in any way failed to procedurally preserve those claims, *see* Secretary Br. 56–60, No. 09-5319 (D.C. Cir. Aug. 9, 2010), resulting in our repeated references to Solomon's "distinct" retaliation claims under Title VII and the Rehabilitation Act. *Solomon*, 628 F.3d at 559–561, 567. To the extent the Secretary raised *any* forfeiture argument below, he did so for the first time in his reply brief during the second round of summary-judgment briefing—and even then, only with respect to "Solomon's April 2004 Accommodations Claim[.]" Reply in Supp. of Def.'s Renewed Mot. For Summ. J. at 2–3, ECF No. 77, No. 07-01590-JDB (D.D.C. July 21, 2011).

By failing to argue forfeiture or a failure to properly plead the claims before the district court, the Secretary has—in a word—forfeited his forfeiture argument here. *See Lennon v. United States Theatre Corp.*, 920 F.2d 996, 1000 (D.C. Cir. 1990) (party's failure to challenge the absence of a necessary pleading under Rule 8 of the Federal Rules of Civil Procedure "in all likelihood waived any waiver defense"); *see also Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 388 F.3d 337, 342–343 (D.C. Cir. 2004) (per curiam) (where defendant "fail[ed] to challenge the complaint under Rule 8, even after" claims were repeatedly asserted, the defendant had sufficient "notice regarding the [claims]," and the complaint accordingly "complied with the Federal Rules").

### B. Merits of the Retaliation Claims

Where, as here, a plaintiff offers only circumstantial evidence of retaliation, her claim is governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–808 (1973). *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under that framework, Solomon must "first establish a prima facie case of retaliation by showing" that (i) "[s]he engaged in statutorily protected activity"; (ii) "[s]he suffered a materially adverse action by h[er] employer"; and (iii) "a causal link connects the two." *Id.* Once a *prima facie* case is established, the burden of production shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its action. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). If the employer does so, the plaintiff must respond with sufficient evidence to "create[] a genuine dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Pardo-Kronemann*, 601 F.3d at 604 (internal quotation marks omitted; second alteration in original).

The district court's entry of summary judgment rested principally on the erroneous premise that Solomon, "as a matter of law," "could not have been reasonably accommodated" and, therefore, the denials of her requested accommodations "cannot be 'adverse[.]'" *Solomon*, 845 F. Supp. 2d at 75. Because that ruling was based on the flawed predicate holding that Solomon's request for a maxiflex schedule was legally foreclosed, that rationale fails here as well.

In the alternative, the district court held that Solomon failed to establish a *prima facie* causal connection between

her December 2003 meeting with an EEO counselor and the denials in the Spring and Summer of 2004 of her various accommodation requests. However, we need not decide whether Solomon established a *prima facie* case of retaliation because the Secretary came forward with a legitimate, non-retaliatory justification for the Department's actions. Once the Secretary did that, the burden-shifting framework fell away, and now the "only question is the 'ultimate factual issue in the case'"—retaliation "'*vel non*.'" *Jones*, 557 F.3d at 678 (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714–715 (1983)); *see also Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009) (once the employer asserts a legitimate, non-discriminatory reason, "the court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case") (internal quotation marks and citation omitted).

With respect to that ultimate factual issue, Solomon contends that a reasonable jury could infer retaliation from: (i) the withdrawal on April 23rd of her permission to work late, (ii) the withdrawal on April 6th of permission to use a privacy curtain, and (iii) the denials of her requests for accommodation. Solomon is correct with respect to her first argument, but not the other two.

### 1. *Revocation of Permission to Work Late*

Solomon contends that her supervisors withdrew her *de facto* flexible schedule, forbidding her to work late, in retaliation either for her filing of a formal EEO complaint eleven days earlier or for the accommodation requests she made. The Secretary responds by stating that the decision not to let her work late on April 23rd was made by temporary supervisors who were unaware of any informal arrangements Solomon might have had with her regular supervisors, did not

know about the formal complaint, and were advised by human resources to have her follow standard policy and work normal duty hours. While it would not be unreasonable for the trier of fact to accept that explanation, the question at this juncture is whether the record forecloses any other plausible conclusion. It does not.

*First*, Solomon came forward with "evidence discrediting" the Department's proffered explanation for the refusal to let her work late. *See Jones*, 557 F.3d at 680. While the Secretary relied on the temporary status of the April 23rd decisionmakers and their alleged ignorance of Solomon's circumstances, Solomon showed—through French's deposition and emails among management officials—that her permanent supervisor (French) ratified and formalized the revocation of her permission to work late after consulting with Human Resources Chief Arleen Christian. Christian was a permanent employee long familiar with Solomon's situation, and French received an email from Solomon discussing her prior arrangement several days before he ratified the decision to revoke it. Thus, Solomon casts doubt on the Secretary's proffered justification, and "we do not routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.'" *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).

*Second*, Solomon's evidence that another budget analyst had been allowed to work hours outside of her normal duty schedule and similar to those Solomon had been working would allow a jury to find that the Secretary's they-were-just-following-policy justification was pretextual. Even the district court thought it "odd that Solomon's supervisors

voiced their objection not to her absence but to her presence, especially if other employees were permitted to work late." *Solomon*, 845 F. Supp. 2d at 73. Such pretext evidence "'usually' is itself sufficient to allow a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 681 (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)). Indeed, "a plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight." *Aka*, 156 F.3d at 1290; *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Accordingly, we hold that Solomon came forward with sufficient evidence to preclude summary judgment on her claim that the revocation of her permission to work late was retaliatory. In so doing, we join our sister circuits in holding that the act of requesting in good faith a reasonable accommodation is a protected activity under 42 U.S.C. § 12203, which is incorporated into the Rehabilitation Act, *see* 29 U.S.C. § 791(g).[6] *Cf. Mayers v. Laborers' Health &*

---

[6] *See, e.g.*, *A.C. ex rel. J.C. v. Shelby County Board of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013); *Cassimy v. Board of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Coons v. Secretary of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004); *Heisler v. Metropolitan Council*, 339 F.3d 622, 632 (8th Cir. 2003); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003); *Weixel v. Board of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002); *Haulbrook v. Michelin N. America*, 252 F.3d 696, 706 (4th Cir. 2001); *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1265 (10th Cir. 2001); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 620 n.9 (5th Cir. 2009) (noting

*Safety Fund*, 478 F.3d 364, 369 (D.C. Cir. 2007) (assuming that accommodation requests are a protected activity under the Americans with Disabilities Act).

Solomon also presses as an additional theory of retaliation the temporal proximity of her filing of a formal EEO complaint on April 12th to the revocation eleven days later of her ability to work late. But that complaint involved the absent-without-leave incident with Lawrence, who was out of the office on April 23rd and the ensuing weeks when French ratified the decision to prohibit Solomon from working late. Therefore, a reasonable jury could not find that the April 12th EEO filing motivated Christian's and French's decision to revoke Solomon's permission to work late. For that reason, Solomon's surviving retaliation claim is that her requests for accommodation motivated her supervisors to revoke her permission to work late.

### 2. *Removal of Privacy Curtain*

Solomon's claim that the April 6th order to remove her privacy curtain was retaliatory does not survive summary judgment. The Secretary came forward with a legitimate, non-retaliatory reason for that action, pointing to Lawrence's expressed concern with keeping the entrances to cubicle work spaces free from obstruction.

Solomon has no answer to that justification other than the order's temporal proximity to her informal attempt to resolve

---

uniformity among the circuits that have decided the issue); 9 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 154.10, at p. 154-105 & n.25 (2d ed. 2014) ("In addition to the activities specifically protected by the statute, courts have found that requesting reasonable accommodation is a protected activity.").

her complaint with Lawrence's superior. While Solomon points out that her then-supervisor, Booth, had allowed her to install the curtain, it was Lawrence, not Booth, who ordered the curtain's removal. Solomon neither contends nor evidences that Lawrence knew Booth had authorized its installation. Nor does Solomon point to any evidence suggesting that Lawrence's safety justification was pretextual, such as evidence that other employees had similar obstructions in the entrances to their cubicles.

Because Solomon lacks "positive evidence beyond mere proximity," she has failed to create a genuine issue of material fact concerning whether the motive for the ordered removal was safety or retaliation. *Woodruff*, 482 F.3d at 530.

### 3. *Denials of Accommodation Requests*

Solomon's remaining retaliation claims cannot survive summary judgment. For each allegedly retaliatory denial of an accommodation request, the Secretary came forward with evidence of a legitimate, non-retaliatory justification that Solomon has left unanswered. Specifically, with respect to Solomon's request for advance sick leave, the Secretary explained that her request did not comply with agency policy because it failed to indicate when or whether she would be able to return to work. Plus Solomon was provided with unlimited leave without pay and participation in the leave donor program instead.

Solomon also presses the requested relocation of her cubicle. The Department of Agriculture never had a chance to process that request, however, because Solomon made it six weeks before she left work on April 23rd and never returned.

Finally, Solomon points to her requests in late May to telecommute or to work part-time. But for that period of time, correspondence from Solomon herself and Dr. Cozzens led Solomon's supervisors to believe that her condition had deteriorated to the point that she was medically unable to work in any capacity. Even if the supervisors incorrectly assessed Solomon's condition, and the Department was thus obligated to provide reasonable accommodation, Solomon must still present evidence casting doubt on the sincerity of the Department's proffered non-retaliatory justification for its action. "Once the employer has articulated a non-discriminatory explanation for its action * * *, the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *See Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation and internal punctuation omitted).

In response to those explanations, Solomon offers only conclusory statements, Solomon Reply Br. 32, devoid of citation to the record, and from which no reasonable jury could make the desired inference that the Secretary's "justifications were mere pretext," *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005), or that a retaliatory reason "more likely motivated" his actions, *Pardo-Kronemann*, 601 F.3d at 604 (internal quotation marks omitted).

\* \* \* \* \*

For the foregoing reasons, we (i) reverse the district court's entry of summary judgment on Solomon's accommodation claim, (ii) reverse the entry of summary judgment on her claim that revoking her permission to work late was in retaliation for requesting accommodations, and

(iii) remand those claims for further proceedings.  We affirm the balance of the district court's grant of summary judgment.

*So ordered.*