# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 8, 2015          Decided August 18, 2015

No. 14-5053

EDNA DOAK,
APPELLANT

v.

JEH CHARLES JOHNSON, SECRETARY, US DEPARTMENT OF
HOMELAND SECURITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01177)

*Anabia Hasan* argued the cause for appellant.  On the brief was *Alan Lescht*.

*John C. Truong*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *R. Craig Lawrence*, Assistant U.S. Attorney.  *Michelle Lo*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, and MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Edna Doak suffers from a variety of debilitating conditions that caused her to miss a significant amount of work, with little or no predictable pattern or advance notice to her employer, the United States Coast Guard. She sought various accommodations from the Coast Guard, which granted many of her requests. But it denied her requests for a later start time and the option to telecommute, among others, because the Coast Guard determined that those accommodations were neither justified by the medical documentation Doak had submitted nor compatible with her job duties. The Coast Guard eventually fired Doak when her attendance did not improve.

Doak then sued the Secretary of the Department of Homeland Security (the Department in which the Coast Guard is housed) ("Coast Guard") under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, alleging that it had unlawfully denied her accommodations and terminated her in retaliation for requesting those accommodations. The district court granted summary judgment to the Coast Guard on the grounds that Doak was not a qualified individual able to perform her job duties even with reasonable accommodations and that she had produced no evidence that would permit a reasonable jury to find that the Coast Guard retaliated against her. We affirm.

# I

## Statutory and Regulatory Framework

Congress enacted the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, "to ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities," *id.* § 701(b)(2). To that end, the Act requires that federal employers provide "reasonable accommodations to the known physical or mental limitations

of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) (provision of the Americans with Disabilities Act that is incorporated into the Rehabilitation Act, *see* 29 U.S.C. § 791(g) (2012) (to be recodified at 29 U.S.C. § 791(f), *see* Pub. L. No. 113-128, § 456(a), 128 Stat. 1425, 1675 (2014))); *see also* 29 C.F.R. § 1614.203(b) (applying to the Rehabilitation Act the standards in the Americans with Disabilities Act regulations, 29 C.F.R. Part 1630). An "otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A), is an individual who has "a physical or mental impairment that substantially limits one or more major life activities," *id.* § 12102(1)(A), and who "can perform the essential functions" of her job "with or without reasonable accommodation," *id.* § 12111(8).

In determining the "essential functions" of a job, "consideration shall be given to the employer's judgment as to what functions of a job are essential[.]" 42 U.S.C. § 12111(8). If an employer "has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id*. The Equal Employment Opportunity Commission ("EEOC"), in turn, has issued regulations defining as "essential functions" those "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n). In deciding what is "essential," the EEOC's interpretive guidance first "focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. Pt. 1630, App. § 1630.2(n). If so, then the question of essentiality comes down to "whether removing the function would fundamentally alter that position." *Id.*

The Rehabilitation Act also prohibits retaliation against an individual for exercising her rights under the Act. As relevant here, the Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed * * * any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

The Rehabilitation Act requires individuals to exhaust administrative remedies before they can file suit to enforce the Act's protections. *See Barkley v. United States Marshals Service*, 766 F.3d 25, 33 (D.C. Cir. 2014); *see also* 29 U.S.C. § 794a(a)(1). For claims against federal agencies, exhaustion requires submitting a claim to the employing agency itself. *See Kizas v. Webster*, 707 F.2d 524, 543–544 (D.C. Cir. 1983) (describing administrative exhaustion process for federal employees as set forth by Title VII, 42 U.S.C. §§ 2000e-5(b), -16(c), and EEOC regulations promulgated under Title VII); 29 U.S.C. § 794a(a)(1) (incorporating certain "remedies, procedures, and rights set forth in" Title VII); *Barkley*, 766 F.3d at 34 (same process under the Rehabilitation Act).

The procedures governing administrative remedies for discrimination claims against federal agencies are set forth in EEOC regulations. *See generally* 29 C.F.R. Part 1614. Those regulations provide the procedural framework for processing complaints of discrimination not just under the Rehabilitation Act, but also under a panoply of federal anti-discrimination laws, including Title VII, 42 U.S.C. §§ 2000e *et seq.* (discrimination on the basis of race, color, religion, sex, and national origin), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, the Equal Pay Act, 29 U.S.C. § 206(d) (sex-based wage discrimination), and the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff. *See* 29 C.F.R. § 1614.103(a).

One of those regulations requires individuals who believe they have been the victim of unlawful discrimination under the relevant laws to consult with an Equal Employment Opportunity ("EEO") Counselor at the agency where they are employed or sought employment "prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action," *id.* § 1614.105(a)(1), although that deadline has exceptions, *id.* § 1614.105(a)(2).

If that informal counseling fails to resolve the matter, the aggrieved individual may then file a complaint with the agency that allegedly discriminated against her. *See* 29 C.F.R. § 1614.106. The filing of that complaint begins the formal administrative grievance process, through which the agency investigates, considers, and decides the merits of the complaint. *See id.* §§ 1614.107–110. Once that process concludes or stalls, the Rehabilitation Act authorizes the filing of a lawsuit in federal court by "any employee or applicant for employment aggrieved by the final disposition of [her administrative] complaint, or by the failure to take final action on such complaint." 29 U.S.C. § 794a(a)(1).

**Factual Background**

From November 2007 until October 2010, Edna Doak worked in the Office of Acquisition Resources Management at the United States Coast Guard, first as a Program Analyst, then as a Management Program Analyst. Her day-to-day responsibilities included monitoring the budget for the Coast Guard's Surface Program, making procurement requests, and attending in-person meetings with a program manager and

support team to plan for the building of boats. Doak's supervisors were Greg Cohen and Rory Souther. Doak's unit normally operated between the hours of 6:00 a.m. and 6:00 p.m., Monday through Friday. When authorized, employees could work flexible schedules within those hours as long as they were physically present in the office during the core business hours of 9:30–10:30 a.m. and 1:30–2:30 p.m. Doak's start time was 8:15 a.m., the latest in her unit. Her schedule consisted of eight "nine-hour days" and one "eight-hour" day, with a regular day off, every two weeks.

Doak suffered from hypothyroidism and depression. In the summer of 2009, Doak suffered closed head trauma in a car accident, exacerbating her depression and resulting in hyperthyroidism, migraines, pain in various locations throughout her body, muscle spasms, memory loss, and obstructive sleep apnea. Doak accordingly submitted a request for intermittent leave under the Family and Medical Leave Act ("FMLA"), which the Coast Guard approved in September 2009.

Doak's illnesses and the side effects of her prescribed medications caused her to miss a significant amount of work over the next few months and often made it difficult for her to get to work on time. Around December 2009 or January 2010, Cohen met with Doak to discuss her work-attendance issues. Cohen returned Doak to working an eight-hour day, and explained that he would reauthorize the nine-hour, regular-day-off schedule once her attendance improved. He also informed Doak that she was using up her leave balances at a rapid clip.

On January 19, 2010, Cohen notified Doak in writing that she had nearly exhausted her twelve weeks of FMLA leave and had negative balances of 233 hours of sick leave and

35.15 hours of annual leave. Cohen also explained to Doak that her continued absences and late arrivals were having a negative impact on the office's work. He added that Doak's repeated failures to request leave in advance violated the procedures for requesting leave, and that continued failure to follow those procedures could result in disciplinary action. Cohen also specifically invited Doak to tell him if she needed an accommodation to do her job.

After receiving that memorandum, Doak was again absent without leave on January 25 and January 26, 2010. On the day of the first absence, Cohen wrote Doak another memorandum, reminding her of the appropriate procedures for requesting leave and asking her to tell him if she had a medical condition that required accommodation. On February 22, 2010, Cohen officially reprimanded Doak by letter for both the January 25th and 26th absences without leave and for failing to follow leave-request procedures.

Doak sought her union's assistance with this issue, after which the Coast Guard agreed to hold the letter of reprimand in abeyance while Doak provided medical documentation to support her absences. On March 9th, Doak notified Cohen that she was submitting three letters from her doctors directly to the Coast Guard's medical review team. The medical review team determined that Doak's letters failed to justify her absences. As a result, Cohen issued a "Request for Medical Documentation" on March 24th, that directed Doak to provide additional information, by April 9th, on the "nature or diagnosis of [her] current condition(s)," including "[r]ecommendations regarding any specific accommodations that are warranted to enable you to perform the essential functions of your position[.]" J.A. 138–139.

A week after the April 9th deadline, Doak submitted her first request for accommodation and supporting medical documentation to human resources. She included a letter from her doctor, Elizabeth P. Berbano, explaining that Doak suffered from major depressive disorder, obstructive sleep apnea, hyperthyroidism, and migraines. Dr. Berbano recommended the following accommodations for Doak: (i) telecommuting; (ii) full-spectrum light for her work space; (iii) an anti-glare computer screen; (iv) a cubicle in an area free from cold air currents; (v) a work schedule of 11 a.m. to 7 p.m. due to Doak's difficulty getting up in the morning; and (vi) the option of weekend hours to make up for missed weekday hours.

A Coast Guard doctor, Erica Schwartz, reviewed Dr. Berbano's letter and recommended that Cohen provide as accommodations the full-spectrum light and an anti-glare computer screen, along with noise-canceling headsets and a dark, private area for her use when medically necessary. Dr. Schwartz did not address the requests for telework, weekend hours, and a later schedule, but later testified that the omission was due to her view that those requests were not medically supported.

On May 6th, Cohen provided Doak with a noise-canceling headset and an anti-glare screen for her computer, permitted her to wear sunglasses in the office as needed, asked that three lights above her desk be turned off, and identified break rooms that she could use as necessary for medical reasons. Cohen also offered to move Doak to a cubicle in an area that was darker, albeit farther away from her work team. In a memorandum to Doak, Cohen explained that he did not approve an 11:00 a.m. start time because Doak's position required her to interact daily and frequently with various staff, and Doak would be unable to perform

those duties with the modified schedule, burdening other employees who would have to pick up work she could not perform.

Doak replied to Cohen on May 21st, proposing a "temporary 10:00am–6:30pm schedule for a month or two." J.A. 459. Doak also explained that, although the new darker cubicle location offered to her "does have the conditions to reduce the occurrence of migraines," she did not want to "move there because it is away from my team and 'project interactions' would be largely reduced." J.A. 460. Cohen responded that a 10:00 a.m. start time was unworkable, and offered instead to change Doak's start time from 8:15 a.m. to 9:00 a.m.

On May 24th, Cohen issued the official reprimand for Doak's absences without leave in January on the ground that she had failed to provide adequate documentation to justify them. Cohen further noted that Doak had been absent without leave for approximately 23.5 hours the week of May 10th, and that she had accumulated an additional 99 hours of unscheduled absences in just the last two months. Cohen further explained to Doak that she had hundreds of hours of negative balances of annual leave, sick leave, and leave without pay.

Seven weeks later, Doak submitted another letter from Dr. Berbano. The letter explained that Doak "suffers from periodic migraines" and "[w]hen she experiences acute onset of a migraine, she is incapacitated due to the pain and cannot concentrate on the tasks at hand, whether at her job or at home." J.A. 462. Dr. Berbano recommended that Doak be given a start time of 9:30 a.m. or the option to telecommute while she adjusted to new medication.

The chief doctor of the Coast Guard's Division of Occupational Medicine reviewed Dr. Berbano's letter and concluded that it did not medically justify "an arbitrary start time of 0930 instead of 0830 or 0900." J.A. 466. The chief doctor also opined that, in light of Doak's unpredictable condition, Doak could not work a fixed schedule because her conditions and the treatment for them completely and unpredictably incapacitated her.

On July 23rd, Doak met with her supervisors, Souther and Cohen, to address her ongoing attendance issues. Doak agreed to a 9:00 a.m. start time, but soon proved unable to arrive at that time with any consistency.

On August 9th, Cohen provided Doak with a notice recommending that she be terminated because of her (i) "medical inability to perform the essential duties of [her] position," including "maintain[ing] [a] regular work schedule," and (ii) extensive hours during which she was absent without leave. J.A. 197. The notice indicated that, from January 31, 2010 to August 9, 2010, Doak missed approximately 52% of her scheduled work hours. The notice further explained that Doak's position required her to be in the office on a daily basis due to the need to interact frequently with project staff. After weighing the matter further, Souther ultimately decided, on September 30, 2010, to terminate Doak's employment, effective October 8, 2010.

**Procedural Background**

Doak contacted an EEO Counselor at her employer on October 6, 2010, to challenge her termination. Doak and the Coast Guard then entered into a settlement agreement, allowing Doak to retire in lieu of termination. Doak revoked that agreement shortly thereafter, and on February 22, 2011,

she filed a formal complaint with the Office for Civil Rights and Civil Liberties at the Coast Guard's parent agency, the United States Department of Homeland Security, alleging that the Coast Guard had unlawfully discriminated against her on the bases of race, national origin, disability, sex, and age, and that her supervisors had retaliated against her exercise of her rights under the Rehabilitation Act. The Office issued its final decision rejecting Doak's complaint on June 19, 2012, finding that the Coast Guard "engaged in good faith efforts to accommodate" Doak. J.A. 294. The Office further concluded that Doak's supervisors offered a legitimate, non-discriminatory, and unrebutted reason for terminating Doak: her "medical inability to perform the essential functions of her position due to her inability to maintain a regular schedule, and her significant number of [absences without leave]." *Id.*

Doak filed suit against the Secretary of Homeland Security on July 18, 2012. She alleged that the Coast Guard discriminated against her in violation of the Rehabilitation Act by (i) twice reprimanding her and then firing her on account of her disability (the "disparate treatment" claims); (ii) failing to provide reasonable accommodations for her disability (the "accommodation claims"); and (iii) firing her in retaliation for requesting reasonable accommodations (the "retaliation claim"). The Secretary moved to dismiss the accommodation and disparate treatment claims under Federal Rule of Civil Procedure 12(b)(1), arguing that Doak had not properly exhausted her administrative remedies because her contact with the EEO Counselor was untimely, and that default stripped the district court of jurisdiction over those claims. The Secretary also moved for summary judgment on all of Doak's claims.

The district court granted the Secretary's motion to dismiss Doak's accommodation claims for lack of subject

matter jurisdiction. *Doak v. Johnson*, 19 F. Supp. 3d 259, 268–270 (D.D.C. 2014). The court explained that Doak requested accommodations on April 16, 2010 and July 16, 2010, and the Coast Guard responded on May 6th and July 20th. *Id.* at 268–269. Because Doak first contacted an EEO Counselor on October 6, 2010—78 days after the July 20th response—the court concluded that Doak had not complied with the regulatory requirement that such contact occur within 45 days of the allegedly discriminatory action, 29 C.F.R. § 1614.105(a)(1). *Id.* at 268–270.[1]

In the alternative, the district court granted the Secretary's motion for summary judgment in its entirety. As to the accommodation claims, the court reasoned that Doak's requested schedule constituted an "open-ended 'work whenever you want schedule' that is unreasonable as a matter of law." *Doak*, 19 F. Supp. 3d at 276. The court also ruled that attending regular on-site meetings was an essential function of Doak's job that no reasonable accommodation would have enabled her to perform. *Id.* at 278–280.

As to the retaliation claim, the district court concluded that Doak's claim failed because she had not proffered any evidence to rebut the Coast Guard's legitimate, non-discriminatory reason for its action: that it terminated Doak due to her repeated absences, failure to comply with leave procedures, and the detrimental effect Doak's absences had on her coworkers. *Doak*, 19 F. Supp. 3d at 280–281.

---

[1] The court applied the same reasoning to the disparate treatment claims arising from the letters of reprimand and the notice proposing termination. *Doak*, 19 F. Supp. 3d at 270 & n.13. Doak has not raised any disparate treatment claims on appeal.

**II**

**Analysis**

*Jurisdiction*

The district court concluded that it lacked subject matter jurisdiction over most of Doak's claims because Doak failed to comply with the regulatory requirement that an aggrieved person contact an EEO Counselor "within 45 days of the date of the matter alleged to be discriminatory[.]" 29 C.F.R. § 1614.105(a)(1). Although the Coast Guard never objected to the timing of Doak's complaint in the administrative proceedings—and, in fact, issued a final administrative decision disposing of Doak's administrative complaint on the merits—the district court believed it was duty-bound to consider the administrative mistiming anyway. The district court read *Spinelli v. Goss*, 446 F.3d 159 (D.C. Cir. 2006), to hold that timely administrative exhaustion is a jurisdictional requirement under the Rehabilitation Act.

*Spinelli* does not reach that far. In *Spinelli*, this court addressed the jurisdictional consequence of a plaintiff's wholesale failure to file an administrative complaint or to obtain any administrative decision at all. 446 F.3d at 162. This court held that federal court "jurisdiction depended on the 'final disposition of [an administrative] complaint.'" *Id.* (alteration in original) (quoting 29 U.S.C. § 794a(a)(1)). Because the plaintiff in *Spinelli* never filed an administrative complaint, there was never any final administrative disposition of a complaint, or any reviewable final administrative action at all. *Id.* Under those circumstances, *Spinelli* held that the court lacked jurisdiction over the plaintiff's claims. *Id.*

That is all *Spinelli* held. In so ruling, the court did not attach irremediable jurisdictional consequence to every procedural misstep that happens during exhaustion of the administrative process. And certainly not for defaults that occur in the informal process created by EEOC regulation as a non-statutory step preceding the formal agency exhaustion required by statute. To the contrary, this court has ruled that "the administrative time limits created by the EEOC erect no jurisdictional bars to bringing suit." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *see also Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) (45-day time limit in 29 C.F.R. § 1614.105(a) is subject to equitable tolling). Instead, those time limits "function[] like statutes of limitations," and thus "are subject to equitable tolling, estoppel, and waiver." *Bowden*, 106 F.3d at 437. While those cases involved claims under Title VII rather than the Rehabilitation Act, nothing in the Rehabilitation Act or the EEOC regulation warrants treating the same administrative time limit differently based on which claims are involved.

*Spinelli* thus does not bar jurisdiction here because Doak filed and received a final disposition of her administrative complaint. As this court has held, issues concerning how a claimant participates in that administrative process, both procedurally and substantively, are not of jurisdictional moment. *Koch v. White*, 744 F.3d 162, 164–165 (D.C. Cir. 2014) (failure to participate properly in administrative review of Rehabilitation Act claim can be "excused" by the district court, and thus is non-jurisdictional).

That approach, moreover, accords with recent Supreme Court precedent holding that "procedural rules, including time bars," are jurisdictional only "if Congress has clearly state[d] as much." *United States v. Wong*, 135 S. Ct. 1625, 1632 (2015) (internal quotation marks omitted). Congress has not

done so here. Nothing in the Rehabilitation Act refers to administrative time limits at all, let alone "in jurisdictional terms" or in any way suggesting that the jurisdiction of the district courts hinges on timely compliance. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982). Since Congress has not "'clearly state[d]' that the rule is jurisdictional," we will not treat it as such. *Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817, 824 (2013) (alteration in original) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–516 (2006))).

Because the deadline for contacting an EEO Counselor is not jurisdictional, Doak's failure to comply with it may be waived by the agency. And that is what the Coast Guard has done. It never raised the 45-day time limit during the administrative proceedings. Indeed, it "not only accept[ed] and investigate[d] [Doak's] complaint, but also decide[d] it on the merits—all without mentioning timeliness[.]" *Bowden*, 106 F.3d at 438. Having done so, the Coast Guard "now has no legitimate reason to complain about a judicial decision on the merits." *Id.* at 438–439.

The same reasoning disposes of the Coast Guard's argument that Doak's failure to cooperate with its investigation bars her claim. Dismissal based on an employee's failure to cooperate in the investigation is justified only when the lack of cooperation "forces an agency to dismiss or cancel the complaint by failing to provide sufficient information to enable the agency to investigate the claim." *Wilson v. Pena*, 79 F.3d 154, 164–165 (D.C. Cir. 1996). That did not happen here. "Because the agency was able to take final action on the merits of [Doak's] complaint, h[er] suit cannot be barred solely for any default in responding to the agency's request for information." *Id.* at 164; *see also Koch*, 744 F.3d at 164–165.

***The Accommodation Claims***

"We review *de novo* the district court's grant of summary judgment, and can affirm only if the record demonstrates both that 'there is no genuine issue as to any material fact,' and that 'the moving party is entitled to a judgment as a matter of law.'" *Solomon v. Vilsack*, 763 F.3d 1, 8 (D.C. Cir. 2014) (quoting *Pardo–Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).

To withstand summary judgment on her accommodation claims, Doak had to come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability. *See Solomon*, 763 F.3d at 9.

Doak assails the district court's conclusion that her request to change her work hours to an 11:00 a.m. start time, with optional weekend hours and the ability to telecommute, sought an "open-ended 'work whenever you want schedule' that is unreasonable as a matter of law." *Doak*, 19 F. Supp. 3d at 276. We agree with Doak. "[I]t is rare that any particular type of accommodation will be categorically unreasonable as a matter of law." *Solomon*, 763 F.3d at 10. Certainly nothing about the accommodations Doak requested, on their face, suggests that they are so inherently unworkable for all employees in all workplaces that the law would categorically disqualify them from consideration. Quite the opposite, the Rehabilitation Act expressly recognizes "job restructuring" and "part-time or modified work schedules" as

reasonable accommodations, 42 U.S.C. § 12111(9)(B), and the federal government's own personnel regulations permit agencies to establish work schedules that are compressed or have substantial flexibility in their hours, 5 C.F.R. § 610.111(d).

Doak's claim fails nevertheless because, even with her desired schedule accommodation, Doak would have been unable to perform an essential function of her job: being present in the office to participate in interactive, on-site meetings during normal business hours and on a regular basis.

The Coast Guard proffered substantial evidence that in-person attendance at such meetings was an essential function of Doak's job. A December 18, 2009 progress note in Doak's file, for example, states: "Due to * * * [required] daily meetings with project managers and staff and required interaction with the project team and other surface business managers[,] [Doak] will be behind her contemporaries due to absences this period." J.A. 115. Cohen's January 19, 2010 memorandum similarly explained that Doak's job "requires daily interaction with the project staff, contracting, and resource staffs," and that her "unplanned absences do not allow us to provide timely support to [a particular boat-building project]." J.A. 120. Cohen again noted in his August 9, 2010 notice proposing Doak's termination that a "critical part" of Doak's job was "[p]roject interaction," which required her "to be in the office during normal work hours in order to interact with project staff." J.A. 201. Finally, Souther explained in his termination decision that Doak's "frequent unscheduled absences prevent [her] from participating in program meetings and other work group collaboration essential to full performance, creating an undue hardship on co-workers required to perform these responsibilities on [Doak's] behalf." J.A. 212–213.

18

A later start time would not have allowed Doak to fulfill those responsibilities because Doak's original 8:15 a.m. start time was already the latest start time on her team. Once Doak's disabilities delayed and disrupted her attendance still further, her inconsistent schedule made holding same-day meetings especially difficult. In the four months preceding her termination, Doak had proven unable to arrive even as late as 9:00 in the morning on a regular basis, and she often did not arrive at all. The Coast Guard showed that Doak's absences undermined her ability to perform her job because "not all of" Doak's "job functions were portable due to the customer service expectations, which largely require on-site presence to fulfill." J.A. 429. "Spontaneous meetings" with various personnel "occur frequently[,] * * * often requir[ing] attendees to review the same documentation at the same time." *Id.* Some files could not be conveniently accessed remotely, and the pace of work "can sometimes be too fast for anything other than on-site presence." J.A. 430. Co-workers had to step in to pick up the slack, often on short notice, due to Doak's frequent and unpredictable absences and late arrivals, causing them an "undue burden" and "negatively impact[ing] the accomplishment of the agency's mission." J.A. 431–432.

There is also evidence that Doak's unpredictable migraines incapacitated her, regardless of the time of day or where she was located. As Dr. Berbano explained, when Doak experiences a migraine "she is incapacitated due to the pain and cannot concentrate on the tasks at hand, whether at her job or at home performing routine activities of daily living, such as cooking and doing chores." J.A. 462. And the medicine Doak would then have to take to treat the migraines would "completely incapacitat[e] her while she is under the influence of the medication[.]" *Id.*

Doak failed to come forward with evidence reasonably disputing any of that. In fact, all Doak points to is a single sentence in her declaration stating conclusorily that "an 11:00 a.m. start time would not have interfered with my ability to do my job because there were few project interactions," and then added the non-responsive observation that "I had not been required to travel or attend an off-site class in over a year." J.A. 250. That sentence, devoid of any detail, explanation, or evidentiary corroboration, contradicts Doak's own deposition testimony, in which she confirmed that, by May 2010, her job involved interactive meetings "on a regular basis." J.A. 538. It also contradicts Doak's own pre-litigation actions in which she declined to relocate to a cubicle in a darker area, even though it would have reduced "the occurrence of migraines," because it was "away from [her] team and 'project interactions' would be largely reduced." J.A. 460. At her deposition, Doak confirmed that was the reason she declined the proffered accommodation. J.A. 539.

In short, the documentary and testimonial evidence in the record—including Doak's own testimony—points only one way, demonstrating that it was essential to Doak's job that she be present for interactive meetings during normal business hours and that the accommodations she requested would not have enabled her to perform that function. Doak's bare, conclusory statement to the contrary in her declaration—without any supporting detail—is insufficient to create a jury issue in light of overwhelming and undisputed evidence that included her own prior sworn testimony. *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) ("Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony."). Because Doak was unable to perform this essential function of her job even with reasonable accommodation, the Coast Guard was entitled to summary

judgment on her accommodation claims. *See Carr v. Reno*, 23 F.3d 525, 529–530 (D.C. Cir. 1994) (employer entitled to summary judgment because plaintiff's job required physical presence to manually pick up and code papers by a daily deadline and her requested accommodation would not have enabled her to perform that essential function); *see also Samper v. Providence St. Vincent Medical Center*, 675 F.3d 1233, 1238 (9th Cir. 2012) (employer entitled to summary judgment because on-site regular attendance was an essential function for neo-natal nurse and plaintiff's requested irregular schedule compromised that essential function).

### *The Retaliation Claim*

To establish a *prima facie* case of retaliation based on circumstantial evidence, a plaintiff must show that "(i) '[s]he engaged in statutorily protected activity'; (ii) '[s]he suffered a materially adverse action by h[er] employer'; and (iii) 'a causal link connects the two.'" *Solomon*, 763 F.3d at 14 (alterations in original) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). If a *prima facie* case is established, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its action. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal quotation marks omitted). Once the employer does so, the plaintiff must respond with "sufficient evidence to create a genuine dispute on the ultimate issue of retaliation" by showing either directly that "a discriminatory reason more likely motivated the employer," or indirectly that "the employer's proffered explanation is unworthy of credence." *Solomon*, 763 F.3d at 14 (internal quotation marks and brackets omitted).

Doak contends that the Coast Guard terminated her in retaliation for her accommodation requests. The Coast Guard

responds that it had a legitimate, non-discriminatory reason for terminating Doak: her inability to maintain a regular schedule and presence in the workplace, and her frequent and unpredictable absences without leave. Those are the reasons that Souther, Doak's supervisor, gave when he made the ultimate decision to terminate her employment. Because the Coast Guard came forward with a "legitimate, non-retaliatory justification for [its] actions," *Solomon*, 763 F.3d at 14, the only question is whether Doak's evidence "creates a material dispute on the ultimate issue of retaliation," *Jones*, 557 F.3d at 678.

Doak's evidence fails to do so. She points to a "causal temporal link" between her April and July 2010 accommodation requests and the Coast Guard's proposed termination of her employment in August 2010, sixteen weeks after her first accommodation request and three weeks after her last one. Appellant's Br. 24. But to survive summary judgment, Doak had to offer "positive evidence beyond mere proximity." *Solomon*, 763 F.3d at 16 (internal quotation marks omitted). To fill that evidentiary gap, Doak argues that her attendance was improving in the summer of 2010, suggesting that the Coast Guard used her absences as a pretext for unlawful retaliation. That claim just does not hold up to summary judgment standards.

To begin with, Doak points to her statement in a declaration that, "by mid-July [2010,] I was able to arrive by 9:30 a.m. on *most* days *if* I did not have a migraine or body pain." J.A. 251 (emphases added). That statement—which suggests that Doak still arrived late when she suffered from migraines or body pain and even sometimes when she did not—cuts against her as much as for her.

In her declaration, Doak also states that her union representative "did an analysis indicating that my attendance was improving and that as of July 31, 2010" she was "at 85% attendance." J.A. 252. But Doak's attendance exceeded eighty percent only for the two pay periods preceding July 31st; it was far worse before those periods. More importantly, her attendance declined right afterward, in the weeks preceding her termination. As Souther explained in his termination decision, "[a]lthough your unscheduled absences decreased briefly after you received the Notice of Proposed Removal, your unscheduled absences have continued and increased significantly since 10 September 2010." J.A. 212. Doak offered nothing to dispute that.

More to the point, "improving" is not the same thing as "improved." Doak's fleeting increase in attendance still fell short of what her job requires, and it made no meaningful impact on the overall percentage of scheduled work hours that she missed. Doak has thus failed to cast any reasonable doubt on, or create any disputed question of material fact concerning, the Coast Guard's asserted non-retaliatory reason for terminating her. For that reason, the district court properly granted summary judgment to the Secretary on the retaliation claim.

## III

## Conclusion

Doak's failure to timely contact or cooperate with an EEO Counselor does not deprive the court of jurisdiction to decide this case. We affirm the district court's grant of summary judgment to the Secretary on Doak's accommodation and retaliation claims.

*So ordered.*