# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 24-5056**

**September Term, 2024**

FILED ON: JULY 22, 2025

JOHN S. MORTER,

      APPELLANT

v.

PETE HEGSETH, SECRETARY, DEPARTMENT OF DEFENSE,

      APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-00343)

---

Before: MILLETT, KATSAS, and WALKER, *Circuit Judges*.

## **J U D G M E N T**

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and oral argument of the parties. The Court has afforded the issues full consideration and has determined that they do not warrant a published opinion. *See* FED. R. APP. P. 36; D.C. CIR. R. 36(d). For the reasons stated below, it is:

**ORDERED** and **ADJUDGED** that the order of the district court issued on February 26, 2024, entering judgment in favor of appellee, be **AFFIRMED**.

\*    \*    \*

John Morter filed suit against the Secretary of Defense alleging discrimination under the Rehabilitation Act of 1973. Mr. Morter, who worked for an intelligence unit within the Defense Department, was reassigned after he failed multiple polygraph exams designed to identify security vulnerabilities. Mr. Morter argues that the reassignment failed to accommodate his anxiety and its effect on his exam results, in violation of the Rehabilitation Act. We affirm the district court's judgment dismissing Mr. Morter's failure to accommodate and disparate treatment claims.

1

# I

## A

The Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, prohibits federal agencies from engaging in employment discrimination against disabled individuals. 29 U.S.C. § 791(b); *see Adams v. Rice*, 531 F.3d 936, 942–943 (D.C. Cir. 2008). The Act applies to the federal government the same standards enforced under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. *See* 29 U.S.C. § 791(f); *see also* 29 C.F.R. § 1614.203(b); *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014).

The ADA, and so also the Rehabilitation Act, bars discrimination against a "qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). A qualified individual is one who is able to carry out "the essential functions" of an employment position "with or without reasonable accommodation." *Id.* § 12111(8). The meaning of "discriminate" includes the failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability," unless the employer "demonstrate[s] that the accommodation would impose an undue hardship[.]" *Id.* § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a); *Rice*, 531 F.3d at 943.

The Rehabilitation Act requires individuals to exhaust administrative remedies with the employing agency prior to filing suit in court. 29 U.S.C. § 794a(a)(1); *see Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015).

## B

Mr. Morter worked as an Intelligence Analyst with the Defense Intelligence Agency ("DIA") for 15 years. The DIA provides military intelligence for the government and is involved in planning covert intelligence operations. During his employment with the DIA, Mr. Morter was detailed to the United States Special Operations Command ("SOCOM") in Tampa, Florida. Because of the highly secure matters and operations handled by SOCOM, Mr. Morter held Top Secret and Sensitive Compartmented Information clearances. Mr. Morter's wife worked for the DIA as an intelligence officer until, in January 2011, she failed a polygraph exam and was fired.

In March 2011, soon after his wife lost her job, the DIA had Mr. Morter take a polygraph exam, which he failed to pass on the topics of the mishandling of classified information and unauthorized foreign contacts. Over the next four years, Mr. Morter completed four more polygraph exams, all of which resulted in unfavorable outcomes on the same topics.

After failing his third polygraph exam in January 2012, the DIA referred Mr. Morter for an investigation. During interviews with DIA investigators, Mr. Morter explained that he had historically been uncomfortable with the agency's classification guidelines and that he had often attended official functions for his wife's work that foreign nationals also attended. Mr. Morter also admitted to having anxiety while undergoing polygraph exams. He said he had "nightmares

about being interrogated," he "worr[ied] that [he would] not be able to remain calm enough[,]" and his wife's termination had compounded his anxiety. J.A. 176. Mr. Morter also admitted to researching the polygraph exam and coming across ways to "beat the polygraph," but he added that he did not "take any credence in them[.]" J.A. 177. The relevant guidance issued for the Intelligence Community prohibits research into polygraph exams, especially into countermeasures. Soon thereafter, Mr. Morter failed his fourth polygraph exam.

In October 2013, Mr. Morter's doctor, Dr. Heather Magee, diagnosed him with adjustment disorder with anxiety. About a month and a half later, a DIA doctor, Dr. K.M. Soo-Tho, confirmed Dr. Magee's diagnosis and documented Morter's anxiety about polygraph exams. Dr. Soo-Tho concluded, however, that Mr. Morter's disorder should not preclude him from successfully taking polygraph exams. He added that, because Mr. Morter had investigated ways to subvert the polygraph exam, he was no longer a suitable candidate for polygraph examination.

In February 2014, the DIA's Chief of the Defense Intelligence Central Adjudication Facility granted Mr. Morter a favorable security clearance determination conditioned upon him continuing to seek mental health care and complying with treatment recommendations. Around that same time, SOCOM leadership lost confidence in Mr. Morter and barred him from its employ and premises.

After that, a DIA Insider Threat Mitigation Panel reviewed Mr. Morter's case and recommended that he be permanently reassigned from Tampa, Florida to Washington, D.C., where he could work in a less sensitive position. The DIA informed Mr. Morter of his reassignment in May 2014.

In June 2014, Mr. Morter appealed his reassignment. Two months later, the DIA provided Mr. Morter a fifth polygraph exam in an effort to resolve his appeal. Before the fifth polygraph exam, Mr. Morter received from Dr. Michael Rothburd a diagnostic impression of anxiety disorder and post-traumatic stress disorder. When asked by agents whether he had "any medical issues that [he felt] would inhibit [his] ability to successfully complete [the] * * * polygraph examination[,]" he answered, "Yes," and referenced his anxiety and post-traumatic stress disorder diagnoses. J.A. 245.

Mr. Morter's fifth polygraph exam again resulted in an unfavorable outcome on the same classified-information and foreign-contact topics. After the exam, Mr. Morter promptly underwent a psychological consultation with DIA psychologist Dr. Jill Tucillo, who reported that Mr. Morter displayed anxiety symptoms and that psychotherapy seemed "insufficient to address anxiety of this proportion." J.A. 249–250. Two weeks later, Mr. Morter was hospitalized for a panic attack.

The DIA eventually denied Mr. Morter's appeal and maintained his reassignment having concluded that his medical diagnosis "would [not] support a medical deferment from the [polygraph] examination." J.A. 332–333. Mr. Morter chose not to accept the reassignment and instead retired from federal service.

## C

After filing unsuccessful complaints with the DIA's equal employment opportunity office and then the Equal Employment Opportunity Commission, Mr. Morter timely filed suit in the United States District Court for the District of Columbia. His complaint alleges that the Secretary of Defense's reassignment of him: (i) failed to accommodate his disability, (ii) constituted disparate treatment on the basis of disability, and (iii) had a disparate impact. J.A. 4–6. The district court granted summary judgment for the Secretary.[1]

Mr. Morter appealed. A panel of this court has already affirmed the grant of summary judgment on Mr. Morter's disparate impact claim. *Morter v. Hegseth*, No. 24-5056, Per Curiam Order, ECF No. 2078965 (D.C. Cir. Oct. 8, 2024). That leaves the failure to accommodate and disparate treatment claims at issue here.

## II

This court reviews a grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-movant. *See Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007); *Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007).

### A

#### 1

On appeal, Mr. Morter first challenges the district court's determination that he failed to exhaust his failure to accommodate claim. Exhaustion of remedies under the Rehabilitation Act is not jurisdictional, unless there was a "wholesale failure to file an administrative complaint or to obtain any administrative decision at all." *Doak*, 798 F.3d at 1103–1104; *Adams*, 531 F.3d at 952–953 ("A complainant need only file a signed statement with the agency that is 'sufficiently precise to identify the aggrieved individual and the agency and to *describe generally the action(s) or practice(s) that form the basis of the complaint*[.]'") (quoting 29 C.F.R. § 1614.106(c)).

In this case, Mr. Morter submitted informal and formal complaints with the DIA's equal employment opportunity office, which considered and denied his claims. Mr. Morter also sought review by the Equal Employment Opportunity Commission, which similarly denied his claim but issued a right-to-sue notice. Because Mr. Morter filed administrative complaints and obtained agency rulings, any question about the sufficiency of his exhaustion is not jurisdictional. *See also Koch v. White*, 744 F.3d 162, 164–165 (D.C. Cir. 2014) (failure to participate properly, both procedurally and substantively, in administrative review of a Rehabilitation Act claim can be

---

[1] Because the relevant conduct here was taken by the DIA, which is under the authority of the Secretary of Defense, we discuss the conduct of the DIA, rather than the Secretary of Defense, in this decision.

"excused" by the district court, and thus is non-jurisdictional).[2] We therefore assume without deciding that Mr. Morter properly exhausted his accommodation claim, and conclude that his claim nonetheless fails on the merits.

**2**

For Mr. Morter's failure to accommodate claim to survive summary judgment, he had to "come forward with sufficient evidence to allow a reasonable jury to conclude" that (i) he "was disabled within the meaning of the Rehabilitation Act"; (ii) the DIA had notice of his disability; (iii) he "was able to perform the essential functions of [his] job with or without reasonable accommodation"; and (iv) the DIA denied his request for a reasonable accommodation of his disability. *Solomon*, 763 F.3d at 9 (internal citations omitted).

The DIA does not dispute that Mr. Morter's anxiety was a qualifying disability, Gov't Br. 27–59, so we assume that the first prong was met. And the parties agree that the DIA was on notice of his anxiety at least by the time he met with Dr. Soo-Tho. Morter Opening Br. 12–15; Gov't Br. 9–12. So the second prong was met.

Mr. Morter's claim, though, fails at the third prong because he has not come forward with evidence that would allow a reasonable jury to find that he was able to perform the essential functions of his job with or without accommodation. Mr. Morter was an Intelligence Analyst with the DIA and was located at SOCOM, where he regularly handled Top Secret and Sensitive Compartmented Information in support of SOCOM's highly sensitive military operations. J.A. 92, 100, 204–205. Because of that position, Mr. Morter was subject to polygraph examination and insider threat evaluation at any time. *See* J.A. 56–61, 62–70 ("[Polygraph] examinations * * * may be administered at periodic or aperiodic intervals in support of reinvestigations or continuous evaluation."), 114–115.

In addition, as a matter of settled DIA policy, the agency could reassess employment and job responsibilities if there were adverse outcomes on polygraph examinations, and could consider relocating an employee to a less sensitive position. *See* J.A. 115 ("DIA employees who are unable to successfully complete the [polygraph] examination * * * may be relocated to DIA Headquarters, or if already assigned to DIA Headquarters, they may be realigned to a less sensitive position commensurate with their grade.").

Here, the DIA reasonably concluded that Mr. Morter's unfavorable outcomes on five separate polygraph exam queries into the mishandling of classified information and unauthorized

---

[2] Other circuits are in accord. *See Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir. 2000); *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007); *Stewart v. Iancu*, 912 F.3d 693, 700 (4th Cir. 2019); *Sanchez v. Henderson*, 167 F.3d 537, at *2 (5th Cir. 1998); *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *Ballard v. Rubin*, 284 F.3d 957, 964 n.6 (8th Cir. 2002); *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003); *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020); *Gaillard v. Shinseki*, 349 F. App'x 391, 392 (11th Cir. 2009) (per curiam).

foreign contacts necessitated reassignment. To the extent that Mr. Morter's anxiety caused these adverse exam results, his disability rendered him a security vulnerability in a position of such sensitivity that it left no room for error. That is shown by SOCOM leadership's "lost confidence in Mr. Morter's ability to continue serving" there and decision not to retain his services any longer. J.A. 77, 212; *see also* J.A. 206. So "[w]hile the polygraph and reassignment were DIA actions, the ultimate decision to bar [Mr. Morter] came from senior SOCOM leadership, not from DIA[.]" J.A. 206. That decision by SOCOM that Mr. Morter could no longer safely be allowed to perform the sensitive and often-classified work of his position left him unable to perform the essential functions of his job. Even assuming his anxiety caused the adverse polygraph results, the job necessity of being able to pass a polygraph examination designed to mitigate security threats left Mr. Morter unqualified for his position.

In short, because of (i) Mr. Morter's exam results, (ii) the sensitive position he held in a special operations command where Top Secret and other protected intelligence information was routinely handled, and (iii) SOCOM's refusal to keep him in its employ, the DIA has shown that Mr. Morter was no longer qualified for his DIA position at SOCOM.

**3**

Mr. Morter responds that his reassignment violates a Defense Department policy providing that "[n]o unfavorable administrative action (to include access, employment, assignment, and detail determinations) shall be taken solely on the basis of either a refusal to undergo a [polygraph] examination or an unresolved [polygraph] examination, except as provided in sections 6 and 7 of Enclosure 4." J.A. 360 (Enclosure 3 ¶ 2(g)). That provision is of no help to Mr. Morter.

To start, Mr. Morter did not have "an" unresolved polygraph exam; he had *five* of them in a row, with each consistently highlighting the same two areas of vulnerability: the mishandling of classified information and unauthorized foreign contacts. He offers no evidence that the policy applies to such a long and consistent pattern of failures on the same topics.

In any event, Mr. Morter's reassignment falls within the exception at Enclosure 4 paragraph 7. That exception provides that when an employee is unable to resolve all relevant questions on a polygraph exam, the Defense Department component shall afford the individual an opportunity for additional examination. J.A. 371 (Enclosure 4 ¶ 7(a)). Upon further failure, the component may initiate an investigation and come to a final determination. J.A. 371 (Enclosure 4 ¶ 7(b)); J.A. 371 (Enclosure 4 ¶ 7(d)). The parties agree that these steps were followed. Morter Opening Br. 7–19; Gov't Br. 5–18, 54–56.

Mr. Morter, though, points to the provision that says the component may, in addition to the investigation, "temporarily suspend an individual's access to controlled information and deny the individual assignment or detail that is contingent on such access." J.A. 371 (Enclosure 4 ¶ 7(c)). Mr. Morter argues that his reassignment determination was permanent, not temporary.

True enough, Mr. Morter's reassignment was permanent. But the exception provides only that temporary suspension may be used "[a]dditionally" while an investigation is conducted. J.A.

371 (Enclosure 4 ¶ 7(c)). And investigations eventually end in final determinations. Once that final decision is made—as it was for Mr. Morter—the procedure directs only that the individual "shall be advised in writing *of the determination*, that the determination may be appealed to the Head of the relevant DoD Component, and that his or her final determination is conclusive," not temporary. J.A. 371 (Enclosure 4 ¶ 7(d)) (emphasis added). That is exactly what happened here.

For those reasons, Mr. Morter has failed to show that a reasonable jury could find him to be a qualified individual with a disability for his DIA work with SOCOM, and so the district court properly granted summary judgment on his failure to accommodate claim.

**B**

The district court also properly granted summary judgment on Mr. Morter's disparate treatment claim. Mr. Morter has identified nothing in the record that casts doubt on the sincerity of the DIA's—and thus the Defense Secretary's—reasonable belief that Mr. Morter posed a security vulnerability that needed to be mitigated.

In Rehabilitation Act cases, this court applies a three-part burden-shifting framework. *See Solomon*, 763 F.3d at 14; *see also Ali v. Regan*, 111 F.4th 1264, 1268–1269 (D.C. Cir. 2024); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff must prove a *prima facie* case of discrimination. Second, the burden of production then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must prove that the legitimate reason offered by the defendant was actually a pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–253 (1981) (citation omitted); *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005).

We assume without deciding that Mr. Morter made out a *prima facie* case because the DIA came forth with evidence of a legitimate non-discriminatory reason for its reassignment decision: to wit, the necessity of mitigating the security vulnerability Mr. Morter posed for having failed to resolve five different polygraph exams because of questions about the mishandling of classified information and unauthorized contact with foreign persons. District Court Op. 13–15.

At this stage, then, the only question is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason" for the adverse action "was not the actual reason and that the employer intentionally discriminated against the employee[.]" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–508 (1993)).

The DIA came forward with sufficient evidence for a jury to find that it had a reasonable, sincere, and non-discriminatory reason for reassigning Mr. Morter. Mr. Morter was working for a military command that oversees the military's special operations forces, which underscores the heightened military and national security concerns associated with his position. Mr. Morter's subsequent inability to pass five separate polygraph exams over concerns about the mishandling of classified information and unauthorized contacts with foreign persons could reasonably be

7

found to pose a serious security threat that had to be mitigated. That, in fact, is why SOCOM refused to allow Mr. Morter to remain part of its operations. Given that, a reasonable jury could credit the DIA's explanation and find no disparate treatment.

That brings us to the question of whether Mr. Morter came forward with sufficient evidence to create a jury question as to whether disability discrimination instead was the real reason for his reassignment. Mr. Morter offers five arguments that do not, either individually or collectively, create a reasonably disputed question of fact concerning the reason for the DIA's action.

*First*, Mr. Morter says that we are asking the wrong question. In his view, his *prima facie* case for discrimination is so strong that the district court should have assumed that the DIA's proffered rationale is pretextual. Morter Opening Br. 40–43. That argument fails twice over.

For one, Mr. Morter raised this contention for the first time on appeal. His unexplained failure to present it to the district court in the first instance forfeits the argument. *See Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1197 (D.C. Cir. 2018).

For another, Mr. Morter's assumption that summary judgment can be looked at through a one-sided lens is wrong. The purpose of summary judgment is to test whether any disputed question of material fact remains for a jury to resolve. *See Feld*, 909 F.3d at 1194 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). With both Mr. Morter's evidence and the DIA's in the record, it would make no sense to ask at summary judgment a question the jury will never decide: could the jury—without considering the defense's evidence at all—reasonably rule for the plaintiff? So, contrary to Mr. Morter's framing, he does not seek a presumption of discrimination. He seeks a truncation of the summary judgment inquiry altogether.

*Second*, Mr. Morter argues that Stephen Norton, the DIA's Director of Security and the final decisionmaker as to Mr. Morter's reassignment, failed to sufficiently consider certain medical evidence, such as Dr. Rothburd's diagnostic impression of anxiety disorder and post-traumatic stress disorder. That argument does not work.

Mr. Morter, however, offers no evidence that he ever provided Dr. Rothburd's letter to the DIA prior to his reassignment. Anyhow, Mr. Norton expressly referenced the disabilities that Mr. Morter "claimed * * * [to] ha[ve] been diagnosed with," including anxiety disorder and post-traumatic stress disorder, J.A. 333, and concluded that security concerns required Mr. Morter's reassignment. Mr. Norton pointed to Dr. Soo-Tho's expert judgment that the symptoms of Morter's adjustment disorders—taking them as given—are "probably easily attenuated by [polygraph] examination procedures and should not preclude an individual's ability to successful[ly] complete [polygraph] examination[]." J.A. 191, 333.

To be sure, even if Mr. Norton had seen Dr. Rothburd's diagnostic "[i]mpression," it does not say that Mr. Morter must be excused from polygraph exams. J.A. 181; *see also* J.A. 333 (Mr. Norton's conclusion that the agency did not receive or anticipate receiving "medical diagnos[es] that would support a medical deferment from the [polygraph] examination[]"). And above all, Mr.

8

Norton emphasized the fact that nothing in any doctor's report solves the basic problem that, even if Mr. Morter qualified for a medical deferment, the acutely sensitive SOCOM program in which he worked "d[id] not have the ability to mitigate the loss of the [polygraph] tool (either by SUBJECT's inability to successfully complete the examination process, or through a medical deferment from the [polygraph] examination process)[.]" J.A. 333

*Third*, Mr. Morter points to evidence, including from Dr. Tucillo, to show that the DIA knew his inability to pass the polygraph exams was a result of his anxiety and not because he was a security risk. Morter Opening Br. 48–52. In Mr. Morter's view, this evidence means "a *jury* could find that Morter's extreme anxiety during the polygraph exams stemmed not from any actual security concern." Morter Opening Br. 48 (emphasis added).

That argument does not work either. There is no inconsistency between Mr. Morter's anxiety-induced inability to take polygraph exams and the DIA's conclusion that, without polygraph screening and with his history of exam failures, Mr. Morter posed a security vulnerability that could not be tolerated at a command of such acute military sensitivity. As the DIA explained, even if "the inability to pass the examination does not—on its own—suggest [Mr. Morter is] a risk to national security," his enduring inability to meet "a basic security requirement for all DIA employees[] presents a security vulnerability that must be mitigated." J.A. 109.

In any case, the question at hand is only whether the DIA sincerely and reasonably believed that Mr. Morter had to be reassigned from his Tampa position because his five-time failure of polygraph exams created a security risk that had to be mitigated. And nothing in Dr. Tucillo's report speaks to that question.

*Fourth*, Mr. Morter argues that the DIA showed a lack of urgency by taking several years to administer five separate exams and by waiting until October 2013 to revoke his security clearance, only to reinstate it in February 2014. But that actually demonstrates the care and concern with which the DIA investigated Mr. Morter's case and its efforts to understand and address the nature and impact of his anxiety on the polygraph failures. The DIA followed the agency's own measured process; responded swiftly to each of Mr. Morter's exam failures; afforded Mr. Morter multiple attempts to pass the exam, spaced far enough apart for him to seek mental health services in the interim, *see* J.A. 165, 198; and then took more serious steps when SOCOM refused to work with Mr. Morter. Said another way, the DIA's effort to obtain all relevant information and provide a 15-year employee ample opportunity to succeed does not provide a reasonable basis for a jury to find pretext.

*Lastly*, Mr. Morter argues that the DIA's failure to follow two Department of Defense instructions shows pretext. To start, Mr. Morter points to Enclosure 3 ¶ 2(g), which provides that no unfavorable administrative action shall be taken solely on the basis of an unresolved polygraph examination. That argument fails because, as noted earlier, Mr. Morter's case falls into an exception to the Rule that allows reassignment after a second polygraph exam and an investigation

9

that supports that decision. *See* J.A. 371 (Enclosure 4 ¶ 7).

Next, Mr. Morter points to Enclosure 4 paragraph 2(h), which states that "[t]he Heads of DoD Components * * * shall establish written procedures to * * * [e]xempt or postpone examinations when individuals are considered medically, psychologically, or emotionally unfit to undergo an examination." J.A. 367. The DIA did just that, and its patience, in fact, is the very basis on which Mr. Morter argues above that the DIA's lack of urgency shows pretext. Mr. Morter cannot have it both ways. Anyhow, Enclosure 4 paragraph 2(h) merely requires component heads to develop policies allowing for exemptions. Mr. Morter does not argue that the DIA failed to develop such policies. So nothing here points to pretext.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk

10